Charles G. Martin v. Commissioner.
Charles G. Martin v. Commissioner
Docket No. 5915.
United States Tax Court
1945 Tax Ct. Memo LEXIS 75; 4 T.C.M. (CCH) 924; T.C.M. (RIA) 45309; September 28, 1945
*75 Saul I. Radin, Esq., 67 West 44th St., New York, N. Y., for the petitioner. William Schwerdtfeger, Esq. and Thomas R. Charshee, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent has determined deficiencies in petitioner's income tax for the calendar years 1940 and 1941 in the respective amounts of $8,031.94 and $242.10. Several issues were raised by the petition herein but on only one was evidence adduced at the hearing. That issue is whether respondent erred in disregarding for tax purposes the existence of a partnership purportedly formed in 1940 by petitioner and his daughter to continue a business formerly carried on by petitioner in New York City as the sole proprietor under the name of Hamburg-Bremen Steamship Agency. Since no evidence was offered as to the other issues it must be considered that they have been abandoned. Findings of Fact Petitioner is an individual who, during the years here involved, resided at Valley Stream, Long Island. His returns for 1940 and 1941 were prepared on a calendar year basis and were filed with the collector of internal revenue for the third district of New York. His principal place of *76 business was at 218 East 86th Street, New York. In the first part of 1940, and for several years prior thereto petitioner was engaged in business as a sole proprietor at 218 East 86th Street, New York. This business was carried on under the name of The Hamburg-Bremen Steamship Agency, and, in general, consisted of receiving funds from persons in this country and transmitting them to persons in foreign countries, principally Germany. The transmission of these funds was accomplished by the sale to persons in this country of money orders, travel checks, bonds and currency. The profit of the business depended largely upon the purchase of foreign currency at a low price and the sale of it at a high price. This required a constant expert study of the international money market. A schedule attached to petitioner's tax return for the year 1939 gives the following data concerning this business: Sales
Profit
Money Orders
$250,974.26
$55,994.33
Travel Checks
112,047.28
13,493.34
Bonds and Currency
359,516.53
14,363.09
$722,538.07
83,850.76
Less: Expenses (see below)
40,804.70
Net Profit for Year
$43,046.06
EXPENSES
TAXES
Salaries
$20,193.10
Unemployment Insurance
$ 704.43
Advertising
10,729.90
Social Security
469.64
Rent
5,975.00
Excise (Title 9)
227.98
Telephone
7,666.42
Franchise
462.63
Postage
1,371.02
Capital Stock
91.72
Accounting
650.00
Occupancy
8.65
Entertaining and Gifts
540.59
Gross Receipts
9.18
Fares
114.44
Protection
36.00
Total
$1,974.23
Interest
504.45
Auto Expenses
989.04
DEPRECIATION
Office Supplies
2,335.17
Taxes
1,974.23
Fixtures 1937 1,000.00 10%
100.00
Legal Fees
388.50
Auto 1937 1,502.77 25%
375.69
Towels
41.95
Improvements to
Coal
173.57
leased Prop. 10,741.56 20%
2,148.21
Insurance
912.36
Dues
50.00
$2,623.90
Electricity
686.91
Counterfeit Money
20.00
Miscellaneous
189.73
Depreciation
2,623.90
Commissions
10.15
Window Cleaning
116.00
Total Expenses
$58,292.43
LESS: Amount Chargeable to Hamburg-Bremen Steamship Agency, Inc., of
same address (30% of expenses, based upon gross income) Amount to
corporation
17,487.73
Expenses Applicable To Charles G. Martin (as above)
$40,804.70
*77 As a prerequisite to the carrying on of such a business, petitioner obtained a license from the Banking Department of the State of New York in 1937, the license not being transferable or assignable even to petitioner's executors. Thus, in the event of petitioner's death, his personal representative would have no right to continue this business. Petitioner was required by that department to place on deposit state and Federal bonds with a value of $100,000, and such bonds were so deposited. The business thus licensed was carried on in petitioner's name from 1937 to 1940. In addition to the business above described petitioner also engaged in business as a sole proprietor at 1522 Myrtle Avenue, Brooklyn, New York, and at 1184 Raymond Boulevard, Newark, New Jersey, under the names, respectively, of The Hamburg-Bremen Shipping Agency and Hamburg-Bremen Steamship Agency. No licenses were required or held for these businesses, which were of the same general type as the business of The Hamburg-Bremen Steamship Agency carried on at 218 East 86th Street, but in which petitioner acted as agent for his customers. Petitioner was also an officer and sole stockholder of The Hamburg-Bremen Steamship *78 Agency, Inc., which had its principal place of business at 218 East 86th Street where it shared the premises and the services of employees with The Hamburg-Bremen Steamship Agency, and a branch office in Philadelphia. The corporation acted as the authorized steamship agent for all transatlantic lines. Ordinarily a corporation is not authorized to act as such an agent, but petitioner's request that the agency be granted to his corporation was complied with. His reason for the request was that in case of his death the agency would not be terminated. The sales and gross profits for 1939 of the business carried on by petitioner in Brooklyn were as follows: Sales
Gross Profits
Foreign Merchandise
$ 720.00
$ 144.00
Freight
9,939.91
1,824.76
Foreign Exchange
155,769.11
10,590.69
Notary Fees
200.95
200.95
Commissions Received
3,334.22
$166,629.97
$16,094.62
The sales and gross profits for 1939 of the business carried on by petitioner in New Jersey were as follows: Sales
Gross Profits
Steamship Tickets
$ 629.95
$ 39.25
Money Orders
40,705.11
6,408.27
Travel Checks
31,627.51
1,936.32
Miscellaneous
10,274.65
187.04
Freight
3,484.68
736.60
Bonds and Currency
1,393.60
203.60
$88,115.50
$9,511.08
*79 Shortly prior to November 2, 1940, petitioner and his daughter, Irmgard Martin Nielsen Siebert, discussed the formation of a partnership to take the place of the sole proprietorship operated at 218 East 86th Street, New York, New York. At that time petitioner was 65 years old and in bad health, suffering from serious heart trouble. A partnership agreement was drawn up, with advice of counsel, and executed by petitioner and his daughter on November 2, 1940. The purpose of forming this partnership was to preserve and continue this business after petitioner's death. The first ten paragraphs of this agreement, in brief, provide: 1. The partnership is to continue for a period of fifteen years using the name Hamburg-Bremen Steamship Agency. 2. Petitioner's daughter agrees to buy a one-half interest in the business for $60,000, evidenced by six promissory notes in the sum of $10,000 each, one payable on November 1, 1941, and the others on November 1 of the succeeding five years, the notes to bear interest at the rate of 5 percent per annum. 3. The securities pledged by petitioner with the Banking Department of the State of New York are to be re-registered in the name of both parties *80 doing business as the Hamburg-Bremen Steamship Agency. 4. The daughter shall devote her entire time to "assisting" the petitioner in the management of the business "and shall not be required to make any contribution to the capital of the partnership." 5. Petitioner "shall be the sole manager of the partnership business" and shall receive a salary of $6,000 per year. 6. The daughter shall receive as compensation for her services a salary of $3,000 per year. 7. The profits of the business are to be divided, 60 percent to petitioner, and 40 percent to his daughter. Losses are to be shared in the same proportion. 8. All profits due the daughter "exclusive of any amounts drawn by her from the partnership funds for her own use and benefit as hereinbefore mentioned" shall be applied to the satisfaction of the principal and interest on the six notes. 9. The funds of the partnership shall be deposited in the name of the Hamburg-Bremen Steamship Agency" and shall be drawn by check, to be signed by the party of the first part [petitioner], and all debts and obligations of the partnership shall be paid by check, except petty expense items." 10. The partnership shall assume all *81 debts of the prior business. The remaining eight paragraphs of the agreement provide for the manner in which the residual one-half interest of the petitioner is to become the property of Mrs. Siebert in the event of his death. She is to get the remaining one-half upon executing a note to petitioner's executors in the amount of the value of such interest payable in 15 years, but only on condition that she employ Edmund C. W. Kandler as manager of the business subject to the approval of the executors of petitioner's estate. It is also provided that if Mrs. Siebert pays to certain named individuals 40 percent of the profits of the business for a period of fifteen years after petitioner's death (or less with the approval of his executors) all interest and principal on the six notes are to be waived. Pursuant to this agreement, Mrs. Siebert executed six unsecured promissory notes to her father, each in the sum of $10,000. All were signed on November 2, 1940, and were made payable, one each on November 1, 1941, 1942, 1943, 1944, 1945, and 1946. Mrs. Siebert was not responsible for the payment of the notes from any source other than the profits from the business. None of these notes has *82 been paid. After the execution of the agreement of November 2, 1940, the Banking Department of the State of New York was notified of the existence of a partnership and the bonds deposited with that department by petitioner were re-registered in the name of petitioner and his daughter as depositors. A certificate was also filed on December 2, 1940, with the County Clerk to the effect that petitioner and his daughter were carrying on business under the firm name of Hamburg-Bremen Steamship Agency. Mrs. Siebert began working for her father in 1930 when she was 24 years of age. At that time she did bookkeeping, cashiering, general office work, and made deposits, receiving a salary of $24.00 per week. She was familiar with all branches of the business and knew several banking officials. At that time she was not living with her father, but later and prior to November 2, 1940 she began residing with him. This employment continued on a more or less regular basis until 1937 and thereafter became irregular. In 1940 Mrs. Siebert was separated from her first husband and had a son 12 years of age in her custody. During the taxable year she maintained a home for her son and her father. A substantial *83 part of her time was devoted to taking care of her father because of his ill health. In the years just prior to 1940 she received no regular remuneration, but got whatever funds she wanted or needed, partly as a gift and partly as compensation for services. During the taxable years Mrs. Siebert came to the office several days a week, spending three or four hours there on the days that she came. On those days she took quotations over the telephone, opened the mail, and counted the cash. When Mrs. Siebert was not there, these duties were partially performed by one of the regular employees. However at all times petitioner was in constant contact with the business and was "the active and principal party" therein. It was petitioner and a few old employees who had the expert knowledge of the international money market upon which the success of the business depended. Petitioner considered it expedient for Mr. Edmund Kandler, his "old-time worker" and an employee of the business, to help his daughter in the conduct of the business if he were not there. He also made provision in his will that Kandler should continue with, and advise and counsel Mrs. Siebert in the event of petitioner's *84 death. He further mentioned in his will that he wanted a Mr. Koch and a Mr. Wiedera to continue in the business after his death. Mrs. Siebert never had occasion to run matters by herself, or petitioner was in constant contact with the business by telephone if not at the office. She did not have authority to draw checks on the bank account of the business and at no time during the taxable year did she draw any such checks. The operation and success of the business was dependent upon petitioner's personal efforts, and he was dominant in the control of the business both before and after the execution of the agreement dated November 2, 1940. When this agreement was executed, Mrs. Siebert had no assets of her own. She contributed no money or other property to the business. She was entirely dependent upon her father financially. On his 1939 return petitioner claimed Mrs. Siebert as a dependent, with the explanation "physically incapable". During 1938 and 1939 Mrs. Siebert suffered from a nervous disorder but in 1940 and 1941 she was in good health. Petitioner signed and filed a partnership return in the name of the Hamburg-Bremen Steamship Agency, giving as the nature of the business *85 "Private Bankers." This return covered the fiscal year ended October 31, 1941 and showed a profit for that period of $23,728.51. This income was shown as distributable to Charles G. Martin $14,237.11 (60 percent), and to Irmgard M. Nielsen $9,491.40 (40 percent). Mrs. Siebert did not sign this return. A schedule attached to the return gives the following data concerning the business carried on: Sales
Profits
Money Orders sold
$240,856.35
$41,511.90
Travel Checks and Letters of Credit
12,309.59
1,860.40
Bonds and Currency
656,641.33
26,546.99
Totals
$909,807.27
$69,919.29
Less: Expenses (see below)
46,190.78
Net Profit
$23,728.51
EXPENSES:
Salaries
$23,689.78
Advertising
12,814.43
Rent
5,900.00
Cables and Telephone
21,937.07
Postage
2,437.70
Accounting and Legal
1,437.50
Fares
123.36
Protection
30.00
Interest
5.48
Auto Expenses
862.46
Insurance
325.57
Electricity
594.23
Window Cleaning
108.00
Supplies
1,693.12
Heat
212.45
Towels
40.10
Entertaining
1,307.86
Dues
52.50
Stationery
1,946.58
Taxes
2,351.51
Deprec. Auto
731.92
Improvements
2,432.11
$81,033.73
LESS: Amount Chargeable to
Hamburg-Bremen Steamship
Agency, Inc. (of same ad-
dress)
34,842.95
Net Expenses
$46,190.78
*86 2 months
TAXES: (1940 share)
$ 582.39
Unemployment Insurance
764.91
Social Security
495.34
Title 940
89.81
Licenses
25.21
Franchise
197.75
Gross Receipts
3.60
Capital Stock
187.50
Occupancy
5.00
$2,351.51
DEPRECIATION
Improvements
12,184.99
2,437.00 20%    Improvements (1941)
429.76
42.97 10%    Auto
2,128.03
532.01 25%    Auto (1941)
2,044.40
255.55 12 1/2%
3,267.53
Depreciation: Auto: Nov. and Dec. 1940
75.62
10 months 1941 5/6 of above
656.30
731.92
Improvements: Nov. and Dec. 1940
365.47
10 months 1941
2,066.64
2,432.11
On his return for the calendar year 1940, petitioner reported the income of the business for the first ten months of the year prior to the formation of the alleged partnership, but no income is designated as having been received from partnerships. On his return for the calendar year 1941, petitioner reported the $14,237.11 from the Hamburg-Bremen Steamship Agency. A return for the year 1941 was prepared by an accountant for Mrs. Siebert, on which was reported her portion of the income reflected on the partnership *87 return, but no other income. The return was signed by the accountant but not by Mrs. Siebert. Mrs. Siebert did not know why she had not signed this return. The taxes shown on it were paid by her father with a check drawn on the partnership bank account. She did not receive the partnership income reflected on her 1941 return. The accountant also prepared the partnership return and the petitioner's individual returns for 1939, 1940 and 1941. The Hamburg-Bremen Steamship Agency ceased doing business after June 14, 1941, due to an Executive Order "freezing" foreign credits, but the business has not been liquidated. The bonds are still on deposit with the Banking Department of the State of New York, and the office furniture is still in the offices at 218 East 86th Street. The assets have not been distributed. Petitioner was, in substance and reality, the owner of the income from the business carried on in the name of The Hamburg-Bremen Steamship Agency during the taxable years. Opinion KERN, Judge: The question here presented is whether the purported partnership formed by petitioner and his daughter in 1940 had such reality that the income of the business was the income of the several *88 "partners" and properly taxable to them. This purported partnership, as we have already found, was formed at a time when petitioner was seriously ill and for the purpose of continuing and preserving a profitable business which would have been terminated by his death unless an ararngement such as a "partnership" had been entered into. This is apparent from the oral testimony, from the provisions of the agreement which both accomplished this purpose and also provided for matters of a distinctly testamentary character, and from the circumstances that no other business enterprise of petitioner was involved in any "partnership" arrangement. It was not formed for the purpose of obtaining the capital or services of petitioner's daughter or for the purpose of changing in any way the conduct or character of the business being carried on by petitioner as a sole proprietor. Whether the partnership thus formally established was valid under state law and permitted the continuance of the business after petitioner's death is immaterial in answering the precise question posed under the Federal Revenue Acts with regard to the real owner of the income from the business carried on in the name of *89 the partnership. See , affirming ; (CCA-8, April 24, 1945), affirming . We are of the opinion, reached after a careful examination of all the facts shown by the record herein, that the partnership arrangement entered into by petitioner and his daughter was without substance and that under the Federal Revenue Acts petitioner must be considered as having earned the income here in question and as being properly taxable on account thereof. In no real sense did his daughter contribute any capital to the business nor in fact so far as the record discloses was capital important in the production of the income here in question. It is clear that the prime factor in the production of the income was petitioner's services, experience and exceptional ability. The services contributed by his daughter were inconsequential. See , and . Decision will be entered for respondent.